| |
|---|
| **Lotrean v 3M Co.** |
| 2024 NY Slip Op 31484(U) |
| April 26, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 153361/2020 |
| Judge: Nancy M. Bannon |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:    **HON. NANCY M. BANNON**

_Justice_

| | |
|---|---|
| PART | 61 |

--------------------------------------------------------------------------------X

MARINEL LOTREAN and MARIE LOTREAN,

               Plaintiffs,

        - v -

3M COMPANY F/K/A MINNESOTA MINING AND MANUFACTURING, a Delaware Corporation with its principal place of business in the State of Minnesota, ALBERT KEMPERLE, INC., a New York Corporation with its principal place of business in the State of New York, ATLANTIC RICHFIELD COMPANY, a Delaware Corporation with its principal place of business in the State of Texas, CHEVRON U.S.A. INC, a Penflvania Corporation with its principal place of business in the State of California, CHEVRON PHILLIPS CHEMICAL COMPANY LP, a Delaware Corporation with its principal place of business in the State of Texas, E.I. DU PONT DE NEMOURS AND COMPANY, a Delaware Corporation with its principal place of business in the State of Delaware, EXXON MOBIL CORPORATION, a New Jersey Corporation with its principal place of business in the State of Texas, H. EDELSTEIN AUTOMOTIVE SUPPLY INC., a New York Corporation with its principal place of business in the State of New York, PPG INDUSTRIES, INC., a Pennsylvania Corporation with its principal place of business in the State of Pennsylvania, RUST-OLEUM CORPORATION, SUED INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO RUST-OLEUM CORPORATION, a Delaware Corporation with its principal place of business in the State of Illinois, SAFETY-KLEEN SYSTEMS, INC., a Delaware Corporation with its principal place of business in the State of Massachusetts, SHELL OIL COMPANY, a Delaware Corporation with its principal place of business in the State of Texas, ZEP INC., SUED INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO ACUITY SPECIALTY PRODUCTS, A DIVISION OF ACUITY BRANDS, INC., SUCCESSOR-IN-INTEREST TO LIGHTING EQUIPMENT AND CHEMICAL DIVISIONS OF NATIONAL SERVICES INDUSTRIES, INC., D/B/A ZEP MANUFACTURING F/K/A NATIONAL LINEN SERVICE CORPORATION, a Delaware Corporation with its principal place of business in the State of Georgia,

               Defendants.

--------------------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 153361/2020 |
| MOTION DATE | 12/13/2023 |
| MOTION SEQ. NO. | 022 023 024 025 026 027 |

**DECISION + ORDER ON MOTION**

[* 1]

The following e-filed documents, listed by NYSCEF document number (Motion 022) 387, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 403, 404, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 428, 429, 430, 431, 432, 433, 434, 648, 654

were read on this motion to/for            JUDGMENT - SUMMARY .

The following e-filed documents, listed by NYSCEF document number (Motion 023) 435, 436, 437, 438, 439, 440, 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 512, 513, 514, 515, 516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 568, 569, 570, 571, 572, 649, 655

were read on this motion to/for            JUDGMENT - SUMMARY .

The following e-filed documents, listed by NYSCEF document number (Motion 024) 451, 452, 453, 454, 455, 456, 457, 458, 536, 537, 538, 539, 540, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554, 555, 556, 557, 558, 559, 560, 561, 562, 563, 564, 565, 566, 567, 573, 574, 575, 576, 577, 578, 579, 580, 581, 582, 650, 656

were read on this motion to/for            SUMMARY JUDGMENT(AFTER JOINDER .

The following e-filed documents, listed by NYSCEF document number (Motion 025) 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 472, 508, 509, 510, 511, 583, 584, 585, 586, 587, 588, 589, 590, 591, 592, 593, 594, 595, 596, 597, 598, 599, 600, 601, 602, 603, 604, 644, 645, 646, 647, 651, 657

were read on this motion to/for            JUDGMENT - SUMMARY .

The following e-filed documents, listed by NYSCEF document number (Motion 026) 492, 493, 494, 495, 496, 497, 498, 499, 500, 501, 502, 503, 504, 505, 506, 507, 628, 629, 630, 631, 632, 633, 634, 635, 636, 637, 638, 639, 640, 642, 652, 658

were read on this motion to/for            JUDGMENT - SUMMARY .

The following e-filed documents, listed by NYSCEF document number (Motion 027) 473, 474, 475, 476, 477, 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 609, 610, 611, 612, 613, 614, 615, 616, 617, 618, 619, 620, 621, 622, 623, 624, 625, 626, 627, 641, 643, 653, 659

were read on this motion to/for            JUDGMENT - SUMMARY .

## **INTRODUCTION**

Motion sequence nos. 022, 023, 024, 025, 026 and 027 are consolidated for disposition.

Plaintiff Marinel Lotrean (plaintiff) and his wife Marie Lotrean (Marie), derivatively,

(together, plaintiffs) bring this action for negligence and products liability against defendants for

designing, manufacturing, or selling auto body products that allegedly contained benzene or for

supplying solvents containing benzene that were used in the manufacture of those products.

[* 2]

In motion sequence no. 022, defendant Exxon Mobil Corporation (ExxonMobil) move, pursuant to CPLR 3212, for summary judgment dismissing the complaint.

In motion sequence no. 023, defendant Atlantic Richfield Company (Arco) moves, pursuant to 3212, for summary judgment dismissing the complaint and cross-claims against it.

In motion sequence no. 024, defendant Zep Inc. (Zep), sued individually and as successor-in-interest to Acuity Specialty Products, a division of Acuity Brands, Inc., successor-in-interest to Lighting Equipment and Chemical Divisions of National Services Industries, Inc., D/B/A Zep Manufacturing F/K/A National Linen Service Corporation, moves, pursuant to CPLR 3212, for summary judgment dismissing the complaint.

In motion sequence no. 025, defendant Rust-Oleum Corporation (Rust-Oleum), sued individually and as successor-in-interest to Rust-Oleum Corporation, moves, pursuant to CPLR 3212, for summary judgment dismissing the complaint and the cross-claims against it.

In motion sequence no. 026, defendant E.I. DuPont de Nemours and Company (DuPont) moves, pursuant to CPLR 3212, for summary judgment dismissing the complaint and the cross-claims against it.

In motion sequence no. 027, defendant Shell Oil Company (Shell) moves, pursuant to CPLR 3212, for summary judgment dismissing the complaint and the cross-claims against it.

## **BACKGROUND**

Plaintiff was born in 1972 (NYSCEF Doc No. 409, Chester-Schindler affirmation, exhibit 1, plaintiff deposition tr at 16). Plaintiff's father, Jon Lotrean (Jon), was employed at Camera Auto Body (Camera), an auto body shop with two locations in Queens, New York, from February 1979 through October 1993 (NYSCEF Doc No. 410, Chester-Schindler affirmation,

exhibit 2, Jon deposition tr at 14-17). Plaintiff accompanied his father to Camera's second location approximately 12 times between 1979 and 1982, and beginning in 1982, plaintiff began performing tasks, such as sweeping and cleaning, for pay (NYSCEF Doc No. 409 at 96-98). When plaintiff was 10 years old, Jon taught him how to repair dents in motor vehicles (*id.* at 99-100). By age 12, plaintiff was "laying down primer, doing dent repairs … [and had] even started putting color down" (*id.* at 100). Plaintiff described himself as a "combo man" splitting his time equally between body work and painting (*id.* at 120 and 123). Throughout junior high and high school, plaintiff worked at Camera's main location from 4 p.m. to 7 p.m. three to five days a week, all day Saturdays, full-time during Thanksgiving and Christmas vacations, and 40 to 80 hours a week every summer except in 1984 (*id.* at 106, 108-110, 168 and 285-286). Plaintiff also worked at Camera through college, though it was "hard to estimate" how frequently he was there (*id.* at 291). From 1992 to January 1995, plaintiff worked at Cooper Collision, his father's auto body shop in Queens (*id.* at 90-91).

Plaintiff alleges that he used products manufactured by defendants 3M Company f/k/a Minnesota Mining and Manufacturing (3M), PPG Industries, Inc. (PPG), DuPont, Rust-Oleum, Safety-Kleen Systems, Inc. (Safety-Kleen) and Zep at Camera. Defendants Chevron U.S.A. Inc., Chevron Phillips Chemical Company LP, Arco, ExxonMobil and Shell allegedly supplied solvents that were incorporated into those products. Camera purchased the finished products from defendants Albert Kemperle, Inc. (AKI) and H. Edelstein Automotive Supply Inc. (HEAS) (NYSCEF Doc No. 409 at 588; NYSCEF Doc No. 411, Chester-Schindler affirmation, exhibit 3, aff of Albert Kemperle [Kemperle] ¶ 4; NYSCEF Doc No. 468, Sena affirmation, exhibit H, Barry Edelstein [Edelstein] deposition tr at 10). Camera also ordered Zep products directly from Zep (NYSCEF Doc No. 410 at 189; NYSCEF Doc No. 411, ¶ 4).

While residing in the Netherlands in 2009, Marie observed petechiae, or red spots, on plaintiff's legs (NYSCEF Doc No. 466, Sena affirmation, exhibit E, Marie deposition tr at 33). Plaintiff's physicians informed him that he had a low blood platelet level (NYSCEF Doc No. 409 at 137). Blood tests and a bone marrow biopsy performed at that time were negative for leukemia, HIV, lupus and cancer (*id.* at 140; NYSCEF Doc No. 466 at 33). Plaintiff's platelet count remained below normal levels (NYSCEF Doc No. 409 at 137; NYSCEF Doc No. 466 at 38). On May 10, 2017, plaintiff was diagnosed with myelodysplastic syndrome (MDS) (NYSCEF Doc No. 1, ¶ 24).

Plaintiffs concede that raw or pure benzene was not an ingredient in the products at issue (NYSCEF Doc No. 626, plaintiffs' response to Shell statement of material facts, ¶ 6; NYSCEF Doc No. 639, plaintiffs' response to DuPont statement of material facts, ¶ 5). Instead, plaintiffs allege that solvents derived from petroleum and contaminated with benzene were incorporated into the auto body products plaintiff used at Camera.

Camera Auto Body

Camera's main location was comprised of four buildings (NYSCEF Doc No. 409 at 61). A brick building where painting took place was 75-feet wide, had 20-foot-high ceilings, and could accommodate two vehicles, workbenches and air compressors (*id.* at 61-62 and 68). Plaintiff could not recall if a fan blew air outside, but two bay doors led out to Metropolitan Avenue (*id.* at 77-78). Painters washed their hands with thinner in an adjacent area (*id.* at 63-64). A corrugated tin structure for paint and body work measured five car lengths long, two car lengths high, and had an eight- to 10-foot ceiling (*id.* at 64, 68 and 72). In 1986 or 1987, Camera erected a wall to create a paint booth (*id.* at 73) and installed a machine for mixing DuPont paint (*id.* at 117). There was no HVAC system, though a fan blew air out onto the street, and there

were two rollup doors (*id.* at 74). Another space in this area could accommodate one vehicle and was accessible from a garage door (*id.* at 64-65). The last building, which was used for bodywork, could accommodate up to six vehicles; a bay door led onto the street and a second door led to an adjacent used car lot (*id.* at 65-66 and 80). This building was not equipped with professional ventilation, though fans were set up for cooling in the summer (*id.* at 80).

DuPont

Camera purchased 55-gallon barrels of thinner manufactured by DuPont from AKI[1] (NYSCEF Doc No. 409 at 47; NYSCEF Doc No. 411, ¶ 6). Employees used thinner to clean their hands, to clean auto parts and to "thin[ ] out" primer or paint (NYSCEF Doc No. 409 at 36-38, 47-48 and 171).

Camera purchased Prep-Sol, a less expensive thinner or degreaser manufactured by DuPont, from AKI (NYSCEF Doc No. 412, Chester-Schindler affirmation, exhibit 3, Kemperle deposition tr at 41; NYSCEF Doc No. 410 at 36-38 and 159). Plaintiff testified that he would soak a rag with Prep-Sol to clean vehicles before applying primer and paint, to remove grease, and to remove paint from his face and hands (NYSCEF Doc No. 409 at 334-337). He also used a "solvent" that was not labeled Prep-Sol in the same manner half the time (*id.* at 527-528).

Camera purchased DuPont paint, including an acrylic "Lucite" paint, and gray- and black-colored primers from AKI (NYSCEF Doc No. 410 at 39-40; NYSCEF Doc No. 412 at 26; NYSCEF Doc No. 411, ¶ 5). Although plaintiff could not recall a specific brand of DuPont paint (NYSCEF Doc No. 409 at 116), Jon stated they used DuPont lacquer and enamel paints (NYSCEF Doc No. 410 at 54-55 and 88-89). Plaintiff explained that it took two minutes to mix

---

[1] Edelstein identified Fein Paint as HEAS's primary supplier for thinner; Fein Paint is no longer in business (NYSCEF Doc No. 468 at 18). HEAS also purchased supplies from PPG in 1987 (*id.*). When asked if HEAS placed its own logo on the thinners it sold, Edelstein replied, "[i]f it was sold by me, it was my brand. If Fein Paint made it, it had their own thinner on it" (*id.* at 19).

[* 6]

thinner and primer in a spray gun and two minutes to apply a single coat of primer, which he could repeat two to three times per vehicle (*id.* at 120-121). After mixing paint with thinner, it would take three minutes to apply a single coat of colored paint, which could be repeated three to five times per vehicle, before adding a clear coat on top (*id.* at 121-122). Plaintiff cleaned the spray guns with thinner by running it through a Safety-Kleen machine or by soaking the parts in thinner and spraying thinner through the nozzle (*id.* at 478-480 and 509).

"Thin" masks, "3M-type" N95 masks and dual cartridge-style respirators were available at Camera (*id.* at 110-111, 113-114 and 223). Plaintiff testified that he was not given a fit test for the N95-type mask or the cartridge-style respirator, was never instructed on how to use the cartridge-style respirator and was never told to replace the filters (*id.* 116 and 241). Plaintiff wore respiratory protection when painting, sanding and grinding, though the length of time he wore such protection varied each day[2] (*id.* at 223-225). He would not wear a mask when walking through an area where painting was taking place (*id.* at 226-227). He used the N95-type mask while painting and applying primer in the paint booth, though he would not wear a mask at all for smaller jobs (*id.* at 243-244 and 246). Plaintiff testified that he "felt dizzy" wearing the respirator when painting (*id.* at 115). He would "suit up" for a full paint job, but not when painting for smaller panels (*id.* at 111-112).

DuPont's corporate representative, Carl Brent Douglas, Ph.D (Dr. Douglas),[3] testified that the Performance Coatings section of DuPont's Fabrics & Finishes Department manufactured paints, thinners and Prep-Sols for the auto body industry (NYSCEF Doc No. 394, Riccardulli

---

[2] Plaintiff believed DuPont manufactured three products used to repair dents in motor vehicles – "Dynalite," a green fiberglass filler, and orange putty (NYSCEF Doc No. 409 at 51-53). According to Kemperle, Dynatron Bondo Co., now owned by 3M, manufactured Dynalite (NYSCEF Doc No. 411, ¶ 8).

[3] DuPont sold its Performance Coating Section to the Carlyle Group in 2013, which renamed it Axalta Coating Systems (NYSCEF Doc No. 394 at 17). Axalta Coating Systems employs Dr. Douglas.

affirmation, exhibit F, Dr. Douglas deposition tr at 14-16 and 152). DuPont manufactured and sold different lines of auto body paints between 1982 and 1993, including "Centari" enamel paint and Lucite acrylic lacquer paint marketed to motor vehicle refinishers like Camera (*id.* at 45-47). From the testimony of plaintiff, Jon and Kemperle, Dr. Douglas believed that Lucite, and possibly Centari, paints and 100-S and 131-S acrylic lacquer primers were used at Camera (*id.* at 48-51 and 59). Based on their proximity to New York, Dr. Douglas assumed that DuPont's plants in Flint, Michigan, Toledo, Ohio, and Front Royal, Virginia manufactured Lucite paints, a plant in Parlin, New Jersey manufactured acrylic thinner, and the Front Royal plant manufactured primers for the New York market (*id.* at 67, 69-71 and 73). Thinners and reducers, both of which were mixtures of solvents, were manufactured in those same plants (*id.* at 78-79 and 182-183).

DuPont manufactured Prep-Sol 2 Cleanup Solvent 3929S and Prep-Sol Solvent 31919S between 1982 and 1993 (*id.* at 174). Based on their testimony, Dr. Douglas believed plaintiff and Jon used Prep-Sol Solvent 31919S (*id.* at 176). Dr. Douglas believed DuPont manufactured Prep-Sol at its Parlin, Toledo and Front Royal plants for the New York market (*id.* at 77).

Dr. Douglas testified that a hydrocarbon is an organic compound that may be refined from crude oil, a process that involves heating crude oil until it fractures or cracks into different substances (*id.* at 39-40). Benzene is a substance produced during the refining process (*id.* at 41). Dr. Douglas stated that xylene, which is a "parent solvent," is not derived from benzene, though it is made from processing crude oil (*id.* at 43). Xylene is its own unique material, but it may carry a trace amount of benzene from the refining process (*id.*). DuPont's auto body paint products contained different hydrocarbon-based solvents, and xylene is in many of DuPont's auto body paints and binders (*id.* at 37, 44, 88-89, 98-99 and 144).

[* 8]

DuPont's raw material specification sheets to its suppliers set a 0.1 percent maximum for benzene (*id.* at 159-160). Dr. Douglas testified that in February 1973, DuPont tested batches of the hydrocarbon-based solvents toluene (H-49), mineral spirits (H-583 and H-287), xylol/xylene (H-583) and Solvesso 150 (H-601) it purchased for their benzene content[4] (*id.* and 163). In 1978, DuPont conducted three spray-out tests of its Lucite paint and took both liquid and airborne samples to test for benzene (*id.* at 171-172). Dr. Douglas was unaware of similar tests performed with Centari paint (*id.* at 172). DuPont conducted additional testing in 1983 to measure the solvents it purchased for their benzene content (*id.* at 158). DuPont did not test Prep-Sol to determine if benzene was a contaminant (*id.* at 180). DuPont was unable to locate any certificates of analysis on tests conducted between 1982 and 1993 (*id.* at 184).

DuPont's purchasing department kept lists of approved suppliers to ensure that there was enough supply of a particular solvent or its equivalent (*id.* at 132-133 and 191). Selecting a supplier from which to purchase a solvent depended upon availability and pricing (*id.* at 134). DuPont listed its approved suppliers and distributors, or companies that resold materials, on raw material specification sheets (*id.* at 145-146 and 166-167). As an example, the specification sheet for Aromatic Controlled VM&P Naphtha-E.O.R. (H-425) from 1981 identified Shell Chemical Company, Petrochemicals Division, as a supplier (*id.* at 152-153).

Dr. Douglas explained there was no way DuPont could trace which supplier's solvents made their way into its products because DuPont no longer had business records from 1982 to 1993 (*id.* at 146 and 192-194), and several plants were no longer in operation (*id.* at 72). The records would have included delivery lot numbers for raw materials and a specific batch number for the finished product (*id.* at 146). Dr. Douglas could not state which entity supplied the

---

[4] DuPont assigned an "H" code to each solvent.

solvents incorporated into Lucite paints between 1982 and 1993 (*id.* at 145). Dr. Douglas also testified that neither ExxonMobil nor Arco designed or manufactured DuPont's products (*id.* at 192-193).

Rust-Oleum

Rust-Oleum manufactured "Stop Rust Automobile Primer" (Stop Rust), an aerosol spray used to prevent rust on bare metal on the underbody of a vehicle (NYSCEF Doc No. 409 at 294-295 and 306). Although the number of times plaintiff used the product varied daily, he estimated he used the product one to three or four times each day and "quite a bit, especially in the earlier days" on older vehicles (*id.* at 300). Plaintiff testified that he would spray one or two coats to the underside of a vehicle while lying on the ground (*id.* at 294-296, 302 and 308-309). Each coat took two to three minutes to apply (*id.* at 309), and the product could drip if it pooled in one spot (*id.* at 297-298 and 308). Plaintiff stated that he would become light-headed after using the product, though it quickly wore off (*id.* at 316). Plaintiff wore protective equipment on his face only half the time when using the Rust-Oleum product (*id.* at 303).

Kemperle testified that he did not know if Camera purchased any Rust-Oleum products (NYSCEF Doc No. 412 at 42). Edelstein stated that HEAS never stocked paint products from Rust-Oleum and did not sell Rust-Oleum products to Camera (NYCEF Doc No. 468 at 14).

Rust-Oleum's director of product stewardship, Megan Gaughan (Gaughan), testified that she was unaware of the exact date Rust-Oleum first began manufacturing Stop Rust, but she believed production began in the 1970s (NYSCEF Doc No. 396, Riccardulli affirmation, exhibit H, Gaughan deposition tr at 33, 54 and 56). Rust-Oleum manufactured Stop Rust in Evanston, Illinois until 1988, when production moved to Pleasant Prairie, Wisconsin (*id.* at 126). Gaughan described Rust-Oleum's products as mixtures based on formulas devised in the research and

[* 10]

development department (*id.* at 39). ExxonMobil, Arco and Shell did not assist in the design or manufacture of Rust-Oleum's products (*id.* at 128-130).

Gaughan testified that Rust-Oleum cannot locate any purchase records for the solvents used to manufacture Stop Rust from 1978 to 1993 because of the passage of time (*id.* at 85-86) and cannot identify the suppliers or the exact solvents that were purchased during that period (*id.* at 91 and 127). Gaughan stated that Rust-Oleum gave its suppliers specifications for the raw materials it purchased, though the company no longer had records from 1978 and 1993 (*id.* at 79 and 105). Gaughan was unaware if Rust-Oleum received certificates of analysis for the raw materials it purchased in that period (*id.* at 105-106). Rust-Oleum relied on material safety data sheets, or MSDS, from its suppliers to verify the composition of the materials it purchased, and therefore, "[Rust-Oleum] would not test our final products to determine if there was something present that wasn't disclosed by the raw material supplier" (*id.* at 63). Gaughan stated that "[t]here would be no reason to test a product to ensure that the formula matches what was manufactured per the instructions" (*id.* at 61), since Rust-Oleum's products were only mixtures (*id.* at 133). Gaughan testified that Rust-Oleum has been a member of the American Coatings Association, formerly known as National Paint & Coatings Association, since at least the late 1970s, and in that time, "there was an industry-wide effort not to exceed 0.1 percent benzene in our paint products" (*id.* at 94-96). This number matched the standard limiting benzene exposure to less than 0.1 percent set by the Occupational Safety and Health Administration (OSHA) (*id.* at 136). Gaughan testified that Rust-Oleum's suppliers were "required to disclose any carcinogen, and benzene in particular above 0.1 percent" (*id.* 131), and "if [benzene] was present at all [in Stop Rust], it was present at less than 0.1 percent" (*id.* at 132).

Zep

Zep manufactured Zep Protective Lubricating Spray (Zep PLS), an aerosol spray lubricant used to loosen rusty nuts and bolts (NYSCEF Doc No. 409 at 377 and 384-385; NYSCEF Doc No. 410 at 173). Plaintiff first began using Zep PLS when he was 11 or 12 (NYSCEF Doc No. 409 at 403). He often used Zep PLS indoors while lying under a vehicle and spraying the product at rusty bolts at a distance of half an arm length (*id.* at 392 and 399). It took 10 to 15 seconds to spray a single coat, and occasionally, he had to apply two coats (*id.* at 402). Each bumper had up to eight bolts, and a car hood had four bolts (*id.*). No one at Camera wore gloves, a mask, or a respirator when using Zep PLS (*id.* at 407; NYSCEF Doc No. 410 at 185-186), and plaintiff testified that he did not wash his hands after using Zep PLS because "the product dried relatively quickly" (NYSCEF Doc No. 409 at 429).

Suhail Kamal Massad, Ph.D (Dr. Massad), a former vice president in Zep's research and development division, identified Zep PLS as a product Zep recommended for use in auto body shops (NYSCEF Doc No. 395, Riccardulli affirmation, exhibit G, Dr. Massad deposition tr at 34 and 55). Dr. Massad was not sure of the date Zep PLS was first sold (*id.* at 111). An aerosol chemist at Zep developed Zep PLS and chose what raw materials to incorporate (*id.* at 59-60). Dr. Massad was unable to locate an active formula for Zep PLS before the formula used for production in 1988 (*id.* at 79). Zep manufactured Zep PLS at its Atlanta, Georgia facility (*id.* at 58). ExxonMobil did not design or manufacture Zep PLS (*id.* at 155).

Dr. Massad testified that Zep maintained a list of approved suppliers for raw materials, but he could not state which supplier supplied what raw material or when at any time between 1979 and 1993 (*id.* at 70-72). Dr. Massad stated that Zep did not have sales or production records for Zep PLS dating back to 1979 (*id.* at 105-107). The production records would have

shown the total amount of each raw material incorporated into each batch of Zep PLS the plant produced (*id.* at 107).

Zep PLS was designed to include hydrocarbon solvents and oils as ingredients (NYSCEF Doc No. 458, Snyder affirmation, exhibit V, Dr. Massad aff, ¶ 11). One such ingredient was Aromatic 100 (NYSCEF Doc No. 395 at 139). Dr. Massad testified that he had located a specification sheet dated May 4, 1993 from ExxonMobil for Aromatic 100, also known as Hi-Sol 10 or M036,[5] in the raw material file Zep maintained for that solvent (*id.* at 139 and 153). Dr. Massad could not state with certainty when Zep purchased M036 from ExxonMobil or if M036 from ExxonMobil was ever used in Zep PLS prior to May 1993, since Zep had other approved suppliers from which to purchase that specific solvent (*id.* at 139, 152 and 155).

Dr. Massad testified that Zep did not test its products for all hazards and that it relied on the material safety data sheets from its suppliers to determine a product's potential hazards (*id.* at 92-93 and 98). Dr. Massad confirmed that raw benzene was not an ingredient in Zep PLS (*id.* at 141). Zep did not test Zep PLS to determine if could release hazardous levels of benzene when it was used as intended by a customer (*id.* at 121). Dr. Massad explained that Zep's material safety data sheets complied with OSHA and California's Proposition 65 regulations[6] (*id.* at 128). Product labels for Zep PLS from 1988, 1989 and 1990 did not list benzene as a hazardous ingredient except labels produced for the California market identified benzene as a Proposition 65 chemical, although they did not state if benzene could cause cancer (*id.* at 123-127).

---

[5] Zep assigned product code M036 to Aromatic 100.
[6] "Proposition 65" is also known as the Safe Drinking Water and Toxic Enforcement Act of 1986 (Cal Health & Safety Code § 25249.5 et seq.).

Arco

Plaintiff testified that he was not familiar with Arco, was not aware if Arco manufactured or supplied products to Camera and did not know if Arco supplied solvents or ingredients used in products sold to Camera (NYSCEF Doc No. 409 at 338 and 547).

Arco's corporate representative, Ingrid Calle (Calle), testified that two divisions at Arco, the Arco Chemical Division and the Lyondell Division, manufactured petrochemical products by cracking crude oil and separating it into benzene, xylene and toluene, and sold those raw materials to companies that incorporated them into products (NYSCEF Doc No. 442, Anyaele affirmation, exhibit 6, Calle deposition tr at 17-19 and 60). Customers gave Arco specifications for the final chemical analysis of the raw material, and Arco tested its products to ensure that they met those specifications (*id.* at 61 and 65). Sales records organized by customer showed that Arco or Lyondell Petrochemical Company supplied paraxylene and nitration-grade toluene to DuPont (*id.* at 35-37, 43-44 and 46) and SMA/styrene maleic anhydride resin and AOK Dry to Zep in 1980 (*id.* at 58). An undated record showed sales of toluene to Rust-Oleum, though Calle believed the document originated prior to 1978 (*id.* at 54-56 and 91). The National Institute for Occupational National Safety and Health (NIOSH) issued a regulatory document on benzene in 1976 and OSHA issued an emergency temporary standard for benzene in 1977 (*id.* at 64 and 84). Calle testified that Arco's then-manager of health and safety endeavored to ensure that Arco voluntarily complied with the "1 PPM" regulatory standard (*id.* at 80-81). Arco sold its Lyondell Division on July 1, 1988 (*id.* at 38). At the time of Calle's deposition in 2023, Arco had not manufactured any products for 20 years and had not manufactured any of the products at issue for 35 years (*id.* at 14).

[* 14]

ExxonMobil

Plaintiff had no personal knowledge or specific recollection of using an ExxonMobil product at Camera and could not recall seeing an ExxonMobil logo on any product (NYSCEF Doc No. 409 at 152-153). However, he believed that ExxonMobil may have supplied petroleum products that made their way into the products he used at Camera (*id.*).

Caterina Tran (Tran), a hydrocarbon fluids core process improvement engineer, testified that ExxonMobil manufactures a hydrocarbon fluids line of products derived from crude oil that includes Varsols, Exxsols, Isopars and Solvessos, the last of which is a heavy aromatic fluid (NYSCEF Doc No. 420, Chester-Schindler affirmation, exhibit 13, Tran deposition tr at 18, 22, 29-30 and 33). Solvessos include Aromatic 100, also known as A-100 or Solvesso 100, and Aromatic 150 (*id.* at 84 and 91). ExxonMobil also manufactures an aromatics line of products including toluene, known as Exxsol hexane, and xylene (*id.* at 82-83). ExxonMobil's processes for manufacturing hydrocarbon products at present are similar to those used in 1979 (*id.* at 36). Tran could not state where ExxonMobil manufactured or refined Varsol, Exxsol, Isopar, Solvesso, and toluene or Exxsol hexane between 1979 and 1993 (*id.* at 81 and 86-87). Tran testified that ExxonMobil manufactured products according to its internal specifications and to sales specifications (*id.* at 41). Sales specifications are documents given to customers explaining "what limits we are trying to achieve, what properties those are, and then what test method was used to measure those properties" in its products (*id.* at 118).

Tran testified that she did not know how often ExxonMobil tested its products between 1979 and 1993 (*id.* at 109-110). Tran could not state whether the product from any specific tank that ExxonMobil tested was sold to DuPont (*id.* at 121). Tran had no knowledge whether ExxonMobil researched the industries that used its hydrocarbon solvents (*id.* at 129). Tran

testified that, at present, her group will try to understand the application or end use of an

ExxonMobil product, but Tran was unaware of what marketing efforts ExxonMobil had engaged

in between 1979 and 1993 (*id.* at 132-134). Tran was also unaware of any specific actions

ExxonMobil had undertaken to promote its solvents to customers, like DuPont (*id.* at 135).

Shell

Plaintiff never saw the Shell logo on any product he used at Camera (NYSCEF Doc No.

409 at 528). However, plaintiffs have alleged that Shell supplied solvents to the manufacturers

of the products used at Camera (*id.*).

Shari London (London) is a senior representative in its post-closing rights and obligations

department at Shell USA, Inc., formerly known as Shell Oil Company (NYSCEF Doc No. 479,

Flora affirmation, exhibit E, London deposition tr at 11 and 48-49). Shell sold hydrocarbon

solvents between 1978 and 1993 (*id.* at 64-65). Shell's customers, not Shell, chose which Shell

product met their needs (*id.* at 182). Shell manufactured its products to its internal specifications

and to its customers' specifications (*id.* at 110).

London testified that the product and safety compliance group, which was part of the

Health, Safety, and Environment Group (HSE) at Shell, creates material safety data sheets for

their solvents; other units at Shell review the sheets before they are issued (*id.* at 105). London

testified that she had never seen a state-specific material safety data sheet, as each sheet

incorporates the information required by several states (*id.* at 135-136). Safety data sheets are

mailed to customers like DuPont and Rust-Oleum (*id.* at 201 and 203-206). London stated that

Shell was unable to locate any certificates of analysis verifying the compositions of the products

at issue in this action (*id.* at 109-110).

[* 16]

London confirmed that Shell sold solvents to DuPont and Rust-Oleum. A spreadsheet from the Chemical Sales Organization, Houston Based Divisions, from December 1978 showed that Shell shipped the following products to DuPont in Flint, Michigan: DMK or acetone; IPA99 or isopropyl alcohol; NBUOH or normal-butyl alcohol; mineral spirits 145EC; VMPNAP or VM&P naphtha EC; CYC-53 or Cyclo-Sol 53; Tolusl 10; CYC-31 or Cyclo-Sol 31; and SCC VMP or Shell Chemical Company or Shell Canada Chemicals VM&P naphtha (*id.* at 179-181). Shell sold toluene and xylene to Rust-Oleum in 1985, 1986, 1987 and 1991 (*id.* at 185 and 191), though London testified that Shell had no knowledge if the toluene or xylene it sold was incorporated into a specific Rust-Oleum product (*id.* at 194-195). London expressed that "DuPont at one time informed Shell that they desired to have solvent products in their supply with less than 0.1 percent benzene" (*id.* at 182). London stated that she had never seen any correspondence from Rust-Oleum indicating that Shell should manufacture a specific chemical to conform to a particular Rust-Oleum standard (*id.* at 183). London testified that Shell published internal standards on benzene exposure and worker health and safety (*id.* at 168). Shell also changed the formulations of its products to reduce their benzene content based on requests by regulatory agencies and Shell's customers (*id.* at 197-198).

## PROCEDURAL HISTORY

Plaintiffs commenced this action on May 26, 2020 by filing a summons and complaint pleading four causes of action for: (1) negligence/gross negligence grounded on manufacturing defect, design defect, and failure-to-warn theories; (2) breach of warranty; (3) strict products liability based on defendants' failure to warn about the dangerous propensities of benzene in their products; and (4) loss of consortium (NYSCEF Doc No. 1). Plaintiff alleges that the auto

body products he used at Camera contained benzene, and that his cumulative exposure to these benzene-containing products through ingestion, inhalation, and dermal contact directly and proximately caused his MDS. In a decision and order dated April 8, 2021, this court dismissed the second cause of action for breach of warranty, denied dismissal of plaintiffs' request for punitive damages, and directed all movants to answer the complaint within 20 days (NYSCEF Doc No. 121-124). Plaintiffs have since discontinued their claims against Safety-Kleen and Chevron Phillips Chemical Company LP (NYSCEF Doc Nos. 225 and 367).

ExxonMobil, Arco and Shell (collectively, the Supplier Defendants) and DuPont, Rust-Oleum and Zep (collectively, the Manufacturer Defendants) now move separately for summary judgment. Plaintiffs oppose the motions.

## DISCUSSION

A party moving for summary judgment under CPLR 3212 "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]). The "facts must be viewed 'in the light most favorable to the non-moving party'" (*Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012] [citation omitted]). If the moving party meets its prima facie burden, the opposing party must "produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action" (*Bazdaric v Almah Partners LLC*, — NY3d —, —, 2024 NY Slip Op 00847, *3 [Feb. 20, 2024] [internal quotation marks and citation omitted]). Conversely, if the moving party fails to meet is prima facie burden, the motion must be denied, regardless of the sufficiency of the opposing party's papers (*Vega*, 18 NY3d at 503).

I. The Supplier Defendants' Motions (Motion Sequence Nos. 022, 023 and 027)

ExxonMobil, Arco and Shell argue that plaintiff cannot demonstrate he was exposed to an ExxonMobil, Arco or Shell product and that they are entitled to summary judgment on that ground.

"In a products liability action, identification of the exact defendant whose product injured the plaintiff is generally required" (*Hymowitz v Eli Lilly & Co*., 73 NY2d 487, 504 [1989], *cert denied* 493 US 944 [1989]).  The plaintiff may establish the identity of the manufacturer or seller through circumstantial evidence; such evidence "must establish that it is reasonably probable, not merely possible or evenly balanced, that the defendant was the source of the offending product" (*Healey v Firestone Tire & Rubber Co*., 87 NY2d 596, 601-602 [1996]).  "Speculative or conjectural evidence of the manufacturer's identity is not enough" (*id.* at 602).  Thus, a party outside the manufacturing, selling or distribution chain cannot be held liable on a strict products liability claim (*Reed v Watts Water Tech., Inc*., 212 AD3d 740, 741 [2d Dept 2023]).  "On a motion for summary judgment, a defendant who asserts that it did not manufacture the allegedly defective product has the initial burden of establishing, as a matter of law, that it did not do so" (*Abulhasan v Uniroyal-Goodrich Tire Co*., 14 AD3d 900, 901 [3d Dept 2005]).  The defendant cannot rely on gaps in the plaintiff's proof to meet its prima facie burden (*Universal Resources Holdings, Inc. v North Penn Pipe & Supply, Inc*., 129 AD3d 1671, 1671 [4th Dept 2015]).

Applying these precepts, the Supplier Defendants have shown that plaintiffs cannot establish an essential element of their prima facie case (*see Verdon v Port Auth. of N.Y. & N.J*., 111 AD3d 580, 582 [1st Dept 2013] [moving parties demonstrated that the plaintiff's circumstantial evidence was insufficient to establish that it was reasonably probable one of them

[* 19]

had supplied the lumber used to construct the guardrail that broke]; *D'Amico v Manufacturers Hanover Trust Co*., 173 AD2d 263, 266 [1st Dept 1991] [reasoning that there was "no testimonial or documentary proof whatsoever that might permit a reasoned inference that Cheseboro, rather than Tilley, was the manufacturer of the ladder, nor do we see how any might be adduced"]; *Gilfaldi v Dumont Co*., 172 AD2d 1025, 1025 [4th Dept 1991] [granting summary judgment where the "plaintiffs did not identify which entities manufactured the chemicals incorporated into the foam insulation installed in plaintiffs' building"]; *but see O'Connor v Aerco Intl., Inc.*, 152 AD3d 841, 842-843 [3d Dept 2017]).  The Manufacturing Defendants' witnesses each testified that their companies maintained lists of approved suppliers for the raw materials in their products, and without any purchase or production records, they were unable to state with certainty which supplier furnished any particular solvent or when and which supplier's solvents were incorporated into their products or when.

Plaintiffs, in opposition, contend that they have shown it is reasonably probable the Manufacturing Defendants sourced the solvents in their products from the Supplier Defendants. Through reverse-engineering, plaintiffs claim to have tied the Supplier Defendants' solvents to the specific solvents in the formulas for the finished products.  To the extent available, plaintiffs have also produced sales and shipping records showing that the Supplier Defendants sold those solvents to the Manufacturing Defendants between 1979 and 1993, the period during which plaintiff claims he was exposed to benzene at Camera.  Plaintiffs have identified the following as ingredients in five DuPont products:

| Product | Solvent |
|---|---|
| Prep-Sol II | Varsol-18 or mineral spirits/MS-145(EC) (H-457) |
| | Aromatic 150 (H-601) |
| | VM&P naphtha (H-425) |
| | Toluene/Tolusol-10 or Tolusol-12 (H-49) |
| Centari Enamel Reducer | Aromatic 150 (H-601) |

| | Toluene or Tolusol-10 or Tolusol-12 (H-49) |
|---|---|
| | VM&P naphtha (H-425) |
| Centari Acrylic Enamel Paint | Aromatic 150 (H-601) |
| | Xylene (H-583) |
| | A-100 or Cyclo-Sol 53 (H-596) |
| | VM&P naphtha (H-425) |
| | Toluene or Tolusol-10 or Tolusol-12 (H-49) |
| Acrylic Lucite Paint | Xylene (H-583) |
| Acrylic Lacquer Thinner | Xylene (H-583) |
| | Toluene or Tolusol-10 or Tolusol-12 (H-49) |
| | VM&P naphtha (H-425) |

ExxonMobil shipped Varsol-18 (H-457), Aromatic 150 (H-601), toluene (H-49), xylene (H-583) and A-100 (H-596) to DuPont plants in Parlin, Toledo, Flint, and/or Front Royal between 1984 and 1993 (NYSCEF Doc No. 415, Chester-Schindler affirmation, exhibit 7).  Arco shipped toluene and xylene to DuPont plants in Parlin and Front Royal in 1981, 1982, and 1983 (NYSCEF Doc No. 520, Chester-Schindler affirmation, exhibit 7).  Shell shipped mineral spirits/MS-145(EC) (H-457), VM&P naphtha (H-425), toluene/Tolusol-10 or Tolusol-12 (H-49), and Cyclo-Sol 53 (H-596) to DuPont plants in Parlin, Toledo, Flint, and/or Front Royal between 1978 and 1993[7] (NYSCEF Doc No. 626, plaintiffs' response to Shell's statement of material facts at 13-18 [tables]).

Xylene and toluene are ingredients in Rust-Oleum's Stop Rust Light Brown Auto Body Primer (NYSCEF Doc No. 616, Chester-Schindler affirmation, exhibit 6).  Arco shipped toluene and xylene to Rust-Oleum's plant in Evanston, Illinois on unknown dates (NYSCEF Doc No. 520).  Shell sold toluene and xylene to Rust-Oleum in 1985, 1986, 1987 and 1991 (NYSCEF Doc No. 617 at 169 and attachments).

---

[7] Plaintiffs allege that exhibit 17 marked at the deposition of Shell's corporate representative contains Shell's sales records (NYSCEF Doc No. 609, plaintiffs mem of law at 7 n 56).  That exhibit, however, consists of a letter dated March 4, 1986, from Shell to a Docket Officer at OSHA (NYSCEF Doc No. 617, Chester-Schindler affirmation, exhibit 7, London deposition tr at 169 and attachment).

[* 21]

As for Zep, its corporate representative testified that Zep PLS contained Aromatic 100, and plaintiffs submit that ExxonMobil sold that solvent to Zep between 1978 and 1993.

In viewing these facts in the light most favorable to plaintiffs, as this court must (*Urias v Daniel P. Buttafuoco & Assoc., PLLC*, — NY3d —, —, 2024 NY Slip Op 01497, *11 [March 19, 2024]), plaintiffs have failed to raise a triable issue of fact. The standard set forth in *Healey* is reasonable probability (87 NY2d at 601), and plaintiffs' proof fails to rise to this level (*Bess v Praxair, Inc*., 139 Fed Appx 369, 370 [2d Cir 2005], *cert denied* 549 US 843 [2006]). First, it is entirely speculative to conclude that the Supplier Defendants' solvents were actually incorporated into the Manufacturing Defendants' products based solely on the fact that the Supplier Defendants shipped solvents to them (*see Sosa v Joyce Beverages*, 159 AD2d 335, 337 [1st Dept 1990] [invoice and receipt for delivery of empty glass bottles from a bottle supplier to a beverage producer 22 days before an accident insufficient circumstantial evidence to establish that the bottle supplier manufactured the bottle that exploded where the beverage producer also received shipments of bottles from other suppliers 18 and 20 days before the accident]). The Manufacturing Defendants' witnesses each testified that their respective companies kept lists of raw materials suppliers, and none of them could identify which suppliers' solvents were used in manufacturing their products or when.

Second, the evidence establishes that multiple suppliers sold the same solvent and that the same solvent appeared in other products that were not used by plaintiff. Based on the records, each Supplier Defendant sold toluene to DuPont, but not every shipment was delivered to the four DuPont plants that could have manufactured products for the New York market nor did each Supplier Defendant sell toluene to DuPont every year plaintiff claims to have been exposed to DuPont's benzene-contaminated products. As another example, xylene is a frequent component

[* 22]

in many DuPont paints, and DuPont manufactured other lines of paint, such as "Imron" paint marketed to the heavy-duty truck industry (NYSCEF Doc No. 394 at 44-47). It is possible that all shipments of xylene supplied by one of the Supplier Defendants could have made their way into a DuPont product other than Centari or Lucite paint. The absence of records from the production and manufacture of the finished auto body products sold to Camera invites the jury to speculate which of the Supplier Defendants' solvents were actually incorporated into those finished products.

Contrary to plaintiffs' contention, DuPont's raw material specification sheets do not identify the Supplier Defendants as standard suppliers. Each sheet lists multiple suppliers for the same raw material, and the number of companies on the list changed each year. As an example, Aromatic 150 (H-601) is a component in Centari Enamel Reducer and Centari Acrylic Enamel Paint. A specification sheet for Aromatic 150 (H-601) issued in June 1984 identifies Exxon U.S.A., Ashland Chemical Co., Union Oil Company of Calif., Chem Central-Detroit (Exxon U.S.A.), Getty Refining, Johan Halterman, B.P., Esso, Shell, and Esso Belgium as approved suppliers for that solvent (NYSCEF Doc No. 418, Chester-Schindler affirmation, exhibit 10). A specification sheet for that same solvent from October 1993 lists Exxon Chemical, Exxon Belgium, Shell, Deutsche Hydrocarbure, and BP as approved suppliers (*id.*).

Plaintiffs have also submitted multiple specification sheets issued by DuPont between 1988 and 1992 for VM&P naphtha (H-425), an ingredient in Prep-Sol II, Centari Enamel Reduce and Centari Acrylic Enamel Paint. Each sheet lists Shell as a supplier, but Ashland Chemical, Texaco Chemical Co., and Unocal Chemicals Corp./Union Oil of California appear as suppliers on nearly every sheet, as well (NYSCEF Doc No. 619, Chester-Schindler affirmation, exhibit 9).

A specification sheet from February 9, 1988, names eight suppliers and also includes a notation that "THERE ARE MORE SUPPLIERS THAN CAN BE REPORTED" (*id.*).

Toluene (H-49) is an ingredient in Prep-Sol II, Centari Enamel Reducer, Centari Acrylic Enamel Paint, and Acrylic Lacquer Thinner. A raw material specification sheet for toluene (H-49) from August 1983 lists Exxon, Arco, and Shell as suppliers, but Charter International Oil Co., Union Oil Company of Calif., Ashland Chemical Co., Big Benn Chemicals & Solvents, Inc., Sun Oil Co., Skelly Oil Co., Tenneco and Texaco appear, as well (NYSCEF Doc No. 433, Riccardulli reply affirmation, exhibit Q at 2). Last, DuPont's specification sheet from 1982 for Varsol-18 or mineral spirits/MS-145(EC) (H-457), a component in Prep-Sol II, identifies Exxon and Shell as just two of the 10 approved suppliers for that solvent (NYSCEF Doc No. 432, Riccardulli reply affirmation, exhibit P at 2).

Rust-Oleum's witness, likewise, testified that Rust-Oleum purchased ingredients for its product from different suppliers. Although Rust-Oleum had no records from 1979 to 1993, plaintiffs' expert industrial hygienist, Enrique Medina (Medina), identified Citgo, Unocal, Ashland and Shell as suppliers of raw materials for Rust-Oleum's "Stop Rust Sprays" between 1996 and 2005 (NYSCEF Doc No. 421, Chester-Schindler affirmation, exhibit 14, Medina 9/14/2023 aff at 15).

Plaintiffs' proof with respect to Zep is similarly deficient. Plaintiffs submit that it is reasonably probable ExxonMobil's Aromatic 100 solvent made its way into Zep PLS based on Dr. Massad's testimony. Dr. Massad's testimony, though, is equivocal. When asked if Zep PLS contained Aromatic 100, Dr. Massad responded "[y]es" (NYSCEF Doc No. 395 at 139). Dr. Massad then produced a technical data or specification sheet for M036/Hi-Sol 10/Aromatic 100 dated May 4, 1993, that Zep had received from ExxonMobil (*id.* at 152). Dr. Massad testified

that Zep kept separate files for its raw materials (*id.* at 153), and that he found the specification sheet in the product file for M036 (*id.* at 139-140). Dr. Massad could not state when the sheet was added to Zep's file or whether ExxonMobil's solvent was used in Zep PLS prior to May 1993 (*id.* at 154). Lilly Cadena (Cadena), an ExxonMobil paralegal, avers that she was asked to conduct a search for sales of "A100" to Zep in Atlanta, Georgia between 1979 and 1993 (NYSCEF Doc No. 429, Riccardulli reply affirmation, exhibit M, Cadena aff ¶¶ 1 and 7). The search yielded no results (*id.*, ¶ 7). Furthermore, Medina identified Ashland as a supplier of M-036/Hi-Sol-10/Aromatic 100, as well (NYSCEF Doc No. Doc 526, Chester-Schindler affirmation, Medina 10/4/2023 aff at 14). Thus, plaintiffs' circumstantial evidence, at most, demonstrates that it was merely possible, not reasonably probable, that the Supplier Defendants' solvents were used in the Manufacturing Defendants' products plaintiff used at Camera.

Plaintiffs' reliance on the doctrine of alternative liability is unavailing.[8] The doctrine of alternative liability permits a plaintiff to recover "where the precise identification of a wrongdoer is impossible" (*Hymowitz*, 73 NY2d at 505). Under this doctrine, "where two defendants breach a duty to the plaintiff, but there is uncertainty regarding which one caused the injury, 'the burden is upon each such actor to prove that he has not caused the harm'" (*id.*, quoting Restatement [Second] of Torts, § 433B [3]). "Recovery under an alternative liability theory requires joinder of all the parties who could have been responsible for a plaintiff's injuries" (*Silver v Sportsstuff, Inc.*, 130 AD3d 907, 909 [2d Dept 2015] [internal quotation marks and citation omitted]; *accord New York Tel. Co. v AAER Sprayed Insulations, Inc.*, 250 AD2d 49, 55 [1st Dept 1998] [the presence of all possible tortfeasors is a critical element of alternative liability theory]).

---

[8] In response to Arco's motion, plaintiffs state that they "are not seeking to invoke the theory of pure, market share liability" and are pursuing claims only against "the limited universe of those they could establish sold solvents to DuPont and Rust-Oleum" (NYSCEF Doc No. 512, plaintiffs mem of law at 17).

[* 25]

Here, plaintiffs have failed to join all suppliers who have, or could have, supplied solvents to the Manufacturing Defendants between 1979 and 1993 as parties (*see Catherwood v American Sterilizer Co*., 139 Misc 2d 901, 906 [Sup Ct, Erie County 1988], *affd* 148 AD2d 985 [4th Dept 1989], *lv dismissed* 74 NY2d 791 [1989] [granting dismissal where the plaintiff failed to join all other distributors and manufacturers]; *see also Girau v Europower, Inc.*, 2017 WL 4124340, *5, 2017 US Dist LEXIS 149410, *12 [SD NY, Sept. 14, 2017, No. 10 Civ. 4320 (NSR)] [same]). The record demonstrates that the Manufacturing Defendants maintained lists of approved suppliers for their raw materials, and as to DuPont, the specification sheets for at least three solvents in its products identified numerous approved suppliers. Plaintiffs, though, elected to pursue claims against only three such suppliers. Thus, plaintiffs have not demonstrated how the doctrine of alternative liability salvages their claims against the Supplier Defendants.

In view of the foregoing, the court need not address the other arguments raised by Supplier Defendants. The motions brought by ExxonMobil, Arco, and Shell for summary judgment dismissing the complaint and the cross-claims asserted against them are granted.

## II. Zep's Motion (Motion Sequence No. 024)

### A. Whether Zep Answered the Complaint

At the outset, the court declines to deny Zep's motion for its alleged failure to timely answer the complaint. Plaintiffs submit that Zep served its answer on July 15, 2021 (NYSCEF Doc No. 146), more than 20 days after it had been directed to do so under the court's April 8, 2021, order and without an extension of time under CPLR 3012. As such, plaintiffs assert that Zep cannot raise the defense that it is an improper party. The argument is unpersuasive. CPLR 2101 (f) provides that "[t]he party on whom a paper is served shall be deemed to have waived

object to any defect in form unless, within fifteen days after receipt thereof, the party on whom the paper is served returns the paper to the party serving it with a statement of particular objections." Plaintiffs have not shown that they served Zep with a notice rejecting its answer, and therefore, they have waived any objection to its timeliness (*see U.S. Bank N.A. v Lopez*, 192 AD3d 849, 850 [2d Dept 2021]).

B. Whether Zep is a Proper Party

Zep contends that it is not a proper party because it is not the successor-in-interest to the company that manufactured Zep PLS. Zep proffers an affidavit from Shari Lotz (Lotz), Zep's Vice President and Chief Human Resources Officer, in support. Lotz avers that Zep Manufacturing Company, which was an unincorporated division of National Services Industries, Inc., manufactured Zep PLS prior to August 2001, and that Zep Manufacturing Company's assets were transferred to The Zep Group, Inc., which later changed its name to Acuity Specialty Products Group, Inc. (ASPG) (NYSCEF Doc No. 458, Snyder affirmation, exhibit U, Lotz aff ¶¶ 7-8). ASPG reorganized in 2007 to form Zep and Acuity Specialty Products, Inc. (ASP) (*id.*, ¶¶ 9 and 11). Lotz further avers that ASPG's assets were assigned to ASP and that ASPG's stock was transferred to Zep, a holding company that did not manufacture, distribute, or sell Zep PLS (*id.*, ¶¶ 4 and 10).

Generally, a parent corporation is not liable for the tortious acts of a subsidiary in the absence of the parent's exercise of complete domination and control (*Margolin v Sonesta Intl. Hotels Corp.*, 85 AD2d 548, 548 [1st Dept 1981]). Here, Zep has failed to meet its prima facie burden, as Lotz's averments concerning Zep's corporate structure are conclusory and unsupported by any documentary evidence. Lotz failed to sufficiently set forth a "valid basis" for the facts set out in her affidavit (*Muslar v Hall*, 214 AD3d 77, 81 [1st Dept 2023]), stating

only that she was competent to testify "based on personal knowledge or otherwise known to me to be true based on documents available to me" (NYSCEF Doc No. 458, Lotz aff ¶ 1). Lotz failed to identify or attach the records she reviewed and relied upon in making her averments (*see Deutsche Bank Natl. Trust Co. v Kirschenbaum*, 187 AD3d 569, 569 [1st Dept 2020]; *Shanahan v Aerco Intl., Inc.*, 172 AD3d 534, 534 [1st Dept 2019]). Tellingly, Zep, in response to plaintiffs' challenge to its proof, submitted a 2001 general conveyance, assignment and assumption agreement, a 2007 contribution agreement, a 2007 distribution agreement and other documents to bolster Lotz's averments, but this cannot remedy basic defects with Zep's prima facie showing (*see Carboni v Alfa Romeo USA*, 220 AD3d 591, 591-592 [1st Dept 2023]). Zep's motion insofar as it seeks summary judgment on the ground that it is not a proper party is denied.

### C. Negligence and Products Liability

"In New York, a product is considered 'defective,' and the manufacturer liable, if the product: (1) 'contains a manufacturing flaw,' (2) 'is defectively designed,' or (3) 'is not accompanied by adequate warnings for the use of the product'" (*Matter of Eighth Jud. Dist. Asbestos Litig*., 33 NY3d 488, 493-494 [2019], quoting *Liriano v Hobart Corp*., 92 NY2d 232, 237 [1998]). Manufacturers and sellers are "under a duty to exercise reasonable care so as to avoid the occurrence of injuries by any product which can reasonably be expected to be dangerous if negligently manufactured or sold" (*Gebo v Black Clawson Co*., 92 NY2d 387, 394 [1998]). In products liability actions, "there is almost no difference between a prima facie case in negligence and one in strict liability" (*Preston v Peter Luger Enters., Inc*., 51 AD3d 1322, 1325 [3d Dept 2008]). Thus, a plaintiff injured by an allegedly defective product may pursue claims under strict products liability (*Finerty v Abex Corp*., 27 NY3d 236, 241 [2016]) and ordinary negligence theories (*Gebo*, 92 NY2d at 394).

1. Design Defect

The part of Zep's motion seeking to dismiss so much of the first cause of action alleging defective design is granted, as plaintiffs do not oppose this branch of the motion (NYSCEF Doc No. 566, plaintiffs' response to Zep's statement of material facts, ¶ 55).

2. Manufacturing Defect

Zep posits that the manufacturing defect claim fails because Zep PLS worked as it was intended. Dr. Massad avers that Zep PLS was an aerosol penetrating lubricant that was "designed, to among other thing, assist users in loosening rust-frozen or soil-impacted nuts, bolts, and screws" (NYSCEF Doc 458, Dr. Massad aff ¶¶ 9-10). Dr. Massad further avers that Zep PLS was designed to include hydrocarbon solvents and oils, which worked together as a penetrating lubricant (*id.*, ¶ 12). Plaintiff testified that Zep PLS "work[ed] well," was "a real good product," was a better product than WD-40, and was "an amazing product" (NYSCEF Doc No. 566, ¶¶ 15-17).

"[I]n strict products liability cases involving manufacturing defects, the harm arises from the product's failure to perform in the intended manner due to some flaw in the fabrication process" (*Denny v Ford Motor Co.*, 87 NY2d 248, 257 n 3 [1995], *rearg denied* 87 NY2d 969 [1996]). The defendant moving for summary judgment dismissing "a strict products liability claim based on a manufacturing defect must submit admissible proof establishing, as a matter of law, that the product was not defective" (*McArdle v Navistar Intl. Corp.*, 293 AD2d 931, 932 [3d Dept 2002]). If the defendant meets this initial burden, the plaintiff must demonstrate, through direct evidence, a triable issue of fact whether there was a defect (*id.*). Where the product is no longer available, the plaintiff may circumstantially prove its claim for a manufacturing defect by showing that the product did not perform as intended and by excluding all other causes for the

product's failure that are not attributable to the defendant manufacturer (*Speller v Sears, Roebuck & Co.*, 100 NY2d 38, 41 [2003]).

In viewing the facts in the light most favorable to plaintiffs, Zep has failed to dispel all questions of material fact (*see Auguste v Edlund Co., LLC*, 213 AD3d 797, 799-800 [2d Dept 2023]). Zep argues that Zep PLS performed as intended based on plaintiff's testimony (*see Sugrim v Ryobi Tech., Inc.*, 73 AD3d 904, 905 [2d Dept 2010] [granting summary judgment dismissing a manufacturing defect claim based on the plaintiff's testimony that that product operated properly]). However, "a defectively manufactured product is flawed because it is mis-constructed without regard to whether the intended design of the manufacturer was safe or not. Such defects result from some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction" (*Caprara v Chrysler Corp.*, 52 NY2d 114, 128-129 [1981] [Jasen, Jones, Meyer, JJ., dissenting], *rearg denied* 52 NY2d 1073 [1981]). Zep PLS was formulated to include hydrocarbon solvents as ingredients, and plaintiffs have alleged that those solvents contained benzene. Dr. Massad testified that Zep never tested Zep PLS for its benzene content. In addition, Zep's expert toxicologist, Christopher M. Long, Sc.D, DABT (Long), states that "[b]enzene is a known trace-level impurity of hydrocarbon solvents including several that were historically used as ingredients in Zep PLS, such as aliphatic solvents, aromatic hydrocarbon solvents, mineral spirits and naphthenic oil"[9] (NYSCEF Doc No. 458, Snyder affirmation, exhibit W, Long aff at 7). Long also states that

---

[9] Long opines that plaintiff's cumulative exposure to the benzene in Zep PLS is only a "small fraction of his expected lifetime exposure from ambient, background sources of airborne benzene – e.g., about 15% of lifetime benzene exposure calculated using the 2009 nationwide median ambient air benzene level" (NYSCEF Doc No. 458, Long aff at 22). Zep argues that such exposure is insufficient to cause MDS (NYSCEF Doc No. 452, Zep mem of law at 13), but Zep has not expressly moved for summary judgment on the issue of causation. Zep raised the issue of causation only in connection to its argument seeking dismissal of the punitive damages claim.

[* 30]

most solvent manufacturers "had either removed products from the marketplace with benzene levels of greater than 0.1% (1,000 ppm) or implemented changes to production processes to reduce levels of benzene impurities" (*id.* at 7). Long then calculated the estimated benzene contents in Zep PLS manufactured between January 1984 and December 1992 and the potential air emission rates from plaintiff's use of the product (*id.* at 6-13). Notably, Long relied on the same DuPont raw material specification sheet as Medina, which set a 0.1% maximum benzene content for solvent CAS No. 8032-32-4, to calculate the assumed benzene contents of Zep PLS produced between January 1984 and December 1992 (*id.* at 8). But, as discussed earlier, Zep never tested Zep PLS to determine its benzene content. Zep further contends that it was not required to report trace amounts of benzene on the MSDS for Zep PLS because the benzene content in the product fell below OSHA's 0.1 % threshold. Whether Zep was required to list benzene on an MSDS, however, does not conclusively demonstrate that the materials used to manufacture Zep PLS were not defective in accordance with the product's specifications.[10]

### 3. Failure-to-Warn

Zep contends that the failure-to-warn claims must be dismissed because plaintiff never read a warning or material safety data sheet for Zep PLS before he used the product.

"[F]ailure-to-warn claims grounded in strict liability and negligence are functionally equivalent, as both forms of a failure-to-warn claim depend on the principles of reasonableness and public policy at the heart of any traditional negligence action "(*Matter of New York City Asbestos Litig*., 27 NY3d 765, 787 [2016]). "A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known …

---

[10] In contrast to the testimony from DuPont's and Rust-Oleum's corporate witnesses, there was no testimony adduced as to whether Zep issued material specifications to its suppliers regarding the benzene content of the solvents Zep purchased.

[* 31]

[as well as] a duty to warn of the danger of unintended uses of a product provided these uses are reasonably foreseeable" (*Liriano*, 92 NY2d at 237 [citations omitted]).  "Failure-to-warn liability is intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause" (*id.* at 243).  The plaintiff bears the burden of demonstrating that the lack or inadequacy of the warning was a proximate cause of the accident, otherwise such claim will be dismissed (*Sosna v American Home Prods*., 298 AD2d 158, 158 [1st Dept 2002]).

Applying these precepts, Zep has demonstrated its entitlement to summary judgment on the failure-to-warn claims (*see Vasquez v Ridge Tool Pattern Co*., 205 AD3d 657, 659 [1st Dept 2022] [dismissing failure-to-warn claim where the plaintiff "admitted that he never read the manual before his accident"]; *M.H. v Bed Bath & Beyond, Inc*., 156 AD3d 33, 38 [1st Dept 2017] [same]).  Plaintiff admitted that he never read the labels on the products he used and had never heard of a material safety data sheet before his deposition (NYSCEF Doc No. 409 at 118 and 431-434).  Jon similarly testified that he did not read the warnings or instructions on the Zep product he used, could not recall if plaintiff read those warnings or instructions on the Zep can, and he never discussed any warnings or instructions on the can of Zep with plaintiff (NYSCEF Doc No. 410 at 187).

### 4. Punitive Damages

Zep's motion for summary judgment dismissing plaintiffs' request for punitive damages is granted, without opposition.  Plaintiffs have stated that they do not oppose this branch of the motion (NYSCEF Doc No. 536, plaintiffs mem of law at 18 n 104).

III. Rust-Oleum's Motion (Motion Sequence No. 025)

    A. Whether the Claims are Time-Barred

Rust-Oleum argues that this action is untimely because plaintiff first experienced low platelet counts in 2009, which Rust-Oleum claims triggered the three-year statute of limitations in CPLR 214-c to bring any claims.

CPLR 214-c (2) provides for a three-year statute of limitations for causes of action stemming from the "latent effects of exposure to any substance or combination of substances." The cause of action begins to run "from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier" (CPLR 214-c [2]). An "injury" for purposes of CPLR 214-c is an "actual illness, physical condition or other similarly discoverable objective manifestation of the damage caused by previous exposure to an injurious substance" (*Sweeney v General Print.*, 210 AD2d 865, 865-866 [3d Dept 1994], *lv denied* 85 NY2d 808 [1995]). "[A] plaintiff must be considered to have discovered such an injury when he or she is actually diagnosed as suffering from a particular disease, even though unaware of its cause" (*id.* at 866). "[A] 'cause of action for damages resulting from exposure to toxic substances accrues when the plaintiff begins to suffer the manifestations and symptoms of his or her physical condition, i.e.[,] when the injury is apparent, not when the specific cause of the injury is identified'" (*Vincent v New York City Hous. Auth.*, 129 AD3d 466, 467 [1st Dept 2015] [citation omitted]; *see also Brightman v Sims*, 188 AD3d 558, 559 [1st Dept 2020] ["[a]n injury is discovered 'when the injured party discovers the primary condition on which the claim is based'"] [internal quotation marks and citation omitted]). Other factors to consider include "whether a plaintiff sought regular medical treatment; whether a plaintiff is limited in physical activity or misses time from

work; and whether a plaintiff files a worker's compensation claim" (*Matter of New York City Asbestos Litig.*, 53 Misc 3d 579, 584-585 [Sup Ct, NY County 2016]).

Under these precepts, Rust-Oleum has failed to demonstrate that the claims are time-barred. Plaintiff's primary condition is MDS, which plaintiffs allege is a type of blood cancer (NYSCEF Doc No. 583, plaintiffs mem of law at 4; NYSCEF Doc No. 409 at 129 ["I came out of this on the other side, cancer free"]). Plaintiff first discovered that he had low platelet counts in 2009, though bone marrow biopsies were negative for cancer. It does not appear that plaintiff missed any time from work, his physical activity was not limited as a result, and his symptoms did not worsen (*compare Ward v Lincoln Elec Co.*, 116 AD3d 558, 559 [1st Dept 2014] [plaintiff experienced "persistent, severe, progressively worsening symptoms that limited his physical activity, for which he sought regular, ongoing medical treatment"]). Plaintiff's physician in the Netherlands concluded that "no diagnosis has been made, in the absence of symptoms and a steady but slight improvement in all numbers" (NYSCEF Doc No. 600, Chester-Schindler affirmation, exhibit 17). Dr. Harrison's statement that plaintiff's "blood count and bone marrow findings in 2009 probably represented abnormalities that eventually became diagnostic for MDS" is too equivocal to establish that the statute of limitations began to run in 2009 (NYSCEF Doc No. 471 at 6). Hence, this early symptom appears to be "too isolated or inconsequential to trigger the running of the Statute of Limitations under CPLR 214-c (2)" (*Cabrera v Picker Intl., Inc.*, 2 AD3d 308, 309 [1st Dept 2003]; *but see Burger v Union Carbide Corp.*, 304 AD2d 700, 701 [2d Dept 2003]). Rust-Oleum's motion insofar as it seeks dismissal of the complaint as time-barred is denied.

B. Whether Stop-Rust Was the Cause-In-Fact of Plaintiff's Injury

Rust-Oleum contends that plaintiffs cannot establish Stop Rust is the cause-in-fact of plaintiff's injury because the opinions of their experts, Medina and Dr. Robert Harrison, M.D. (Dr. Harrison), a physician specializing in occupational medicine, lack a proper foundation. The anticipated expert testimony was set forth in plaintiffs' CPLR 3101 (d) expert disclosures Medina referred to: material safety data sheets for a separate Rust-Oleum product, Smoke Gray alkyd resin high gloss enamel; product composition reports from 1986 to 2000 for toluene, xylene, ethylbenzene, and mineral spirits in Stop Rust sprays that Rust-Oleum exchanged in *Milward v Acuity Specialty Products Group, Inc*. (D Mass, No. 1:07-cv-11944-GAO) (the Milward Action), which involved a different Rust-Oleum product; material safety data sheets from 1996 to 2005 from Citgo, Unocal, Ashland and Shell for mineral spirits, VM&P naphtha, toluene, hexane, xylene, Lacolene, ShellSol and Lactol Spirits; and testimony from former Rust-Oleum employee Robert M. Hall (Hall) in the Milward Action[11] (NYSCEF Doc No. 472, Sena affirmation, exhibit L at 28-29). Rust-Oleum submits that Medina erroneously assumed that the petroleum hydrocarbons in Stop Rust contained 0.1% benzene based on those documents and on DuPont's raw material specifications limiting the benzene content of the petroleum hydrocarbons it purchased to 0.1% (*id.* at 41). Medina then used this information to develop a quantitative assessment of plaintiff's cumulative benzene exposure in Stop Rust (*id.* at 43). Dr. Harrison relied on Medina's flawed report to conclude that plaintiff's exposure to benzene was sufficient to cause his MDS (NYSCEF Doc No. 471, Sena affirmation, exhibit K at 10).

---

[11] The Milward Action involved "aerosol or brush products under the brand name Rust-Oleum that were made as early as the late '70s through around 2000" (NYSCEF Doc No. 587, Chester-Schindler affirmation, exhibit 4, Hall deposition tr at 10), and there were multiple products under the "Stops Rust" brand (*id.* at 32). While Hall discussed the component ingredients in "Stops Rust Quart Brush" (*id.* at 31), there was no testimony about the composition of Stop Rust Automobile Primer, which is the product at issue in this action.

[* 35]

In cases where the plaintiff was exposed to a toxic substance, "an opinion on causation should set forth a plaintiff's exposure to a toxin, that the toxin is capable of causing the particular illness (general causation) and that plaintiff was exposed to sufficient levels of the toxin to cause the illness (specific causation)" (*Parker v Mobil Oil Corp*., 7 NY3d 434, 448 [2006], *rearg denied* 8 NY3d 828 [2007]). The plaintiff bears the burden of "establish[ing] sufficient exposure to a substance to cause the claimed adverse health effect" (*Cornell v 360 W. 51st St. Realty, LLC*, 22 NY3d 762, 784 [2014], *rearg denied* 23 NY3d 996 [2014]). While "precise quantification of exposure is not always required[,] … [the] [p]laintiff[ ] must, using expert testimony based on 'generally accepted methodologies,' still establish sufficient exposure to the toxin even though 'it is sometimes difficult, if not impossible,' to do so" (*Nemeth v Breentag N. Am*., 38 NY3d 336, 343 [2022], quoting *Sean R. v BMW of N. Am., LLC*, 26 NY3d 801, 812 [2016]). "'At a minimum, … there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered'" (*Cornell*, 22 NY3d at 784 [citation omitted]). To prevail on a motion for summary judgment in a toxic tort case, the defendant must demonstrate the lack of general or specific causation (*Dyer v Amchem Prods., Inc*., 207 AD3d 408, 410 [1st Dept 2022]).

It is well settled that an expert's opinion must have an evidentiary foundation (*Diaz v New York Downtown Hosp*., 99 NY2d 542, 544 [2002]). Here, Rust-Oleum attacks the sufficiency of plaintiffs' expert opinions. By doing so, though, Rust-Oleum merely points to perceived gaps in plaintiffs' proof, which is insufficient to satisfy its prima facie burden (*Dyer*, 207 AD3d at 409 [the defendant cannot "simply argue that plaintiff could not affirmatively prove causation, but rather it had to affirmatively prove, as a matter of law, that there was no causation"]). Importantly, Rust-Oleum has not proffered an expert opinion stating that plaintiffs'

claims fail (*see Cokeng v Ogden Cap Props., LLC*, 104 AD3d 550, 550 [1st Dept 2013] [denying summary judgment where the defendants "advanced no affidavit from a toxicology or epidemiology expert, nor did they otherwise eliminate all material issues of fact regarding general and specific causation"]; *Zaslowsky v J.M. Dennis Constr. Co. Corp*., 26 AD3d 372, 374 [2d Dept 2006] [granting summary judgment where the defendant produced "expert evidence based on a scientifically-reliable methodology that there was no causal connection between the … gas leak and the plaintiff's injuries]). Instead, Rust-Oleum waited until its reply to tender an affidavit from certified industrial hygienist Jennifer Sahmel, Ph.D. (Dr. Sahmel), who cites several studies stating that the benzene content of most petroleum solvents fell well below 0.1% after 1983 and opines that Medina overestimated plaintiff's benzene exposure (NYSCEF Doc No. 647, Dr. Sahmel aff, ¶ 12). Rust-Oleum, however, cannot rely on an expert affidavit submitted in reply to establish their prima facie case (*see Migdol v City of New York*, 291 AD2d 201, 201 [1st Dept 2002]). To the extent Rust-Oleum complains that the reports in plaintiffs' CPLR 3101 (d) exchanges are unsworn, it has not cited a statute or caselaw requiring that such exchange must include a sworn report.

Rust-Oleum also contends that plaintiffs have not conducted any tests on Stop Rust to show that the product contained benzene, but "courts must take care not to set the bar at an insurmountable level, thereby inappropriately depriving toxic tort plaintiffs of their day in court," especially where a sample of the toxin has not been preserved (*Temples v Tesa Tape, Inc*., 2011 WL 13388551, *2, 2011 US Dist LEXIS 175189, *4 [SD NY Mar. 11, 2011, No. C06-15409-TSZ], citing *Parker*, 7 NY3d at 447). On this point, assuming Rust-Oleum carried its prima facie burden, plaintiffs have raised a triable issue of fact that Stop Rust contained small amounts of benzene. Toluene is a component in Stop Rust, and Shell and Arco supplied Rust-Oleum with

toluene, as discussed above.[12]  It appears that as of March 1978, the toluene manufactured by Arco contained benzene (NYSCEF Doc No. 595, Chester-Schindler affirmation, exhibit 12 at 3). William G. Eissler (Eissler), Arco's Manager, Safety and Industrial Hygiene, submitted an affidavit to OSHA regarding Arco's ability to comply with OSHA's Permanent Standard for Occupational Exposure to Benzene (*id.* at 1).  Eissler wrote that 41% of the 881 crude and liquid process streams Arco tested in its facilities contained more than 0.1% benzene and 90% of 300 streams tested in four refineries contained more than 0.1% benzene (*id.* at 4).  Additional sampling revealed that 41%, 50%, 84% and 99% of streams at four chemical facilities contained more than 0.1% benzene (*id.* at 5).  Medina cites two "published studies documenting benzene content of petroleum hydrocarbons above 0.1% in the time period of [plaintiff's] work in the auto body industry" in his sworn report from October 4, 2023 (NYSCEF Doc No. 588, Chester-Schindler affirmation, exhibit 5, Medina 10/4/2023 aff at 28).  One study titled "Benzene-contaminated toluene and acute myeloid leukemia: a case series and review of literature" (the Peckham Study) published in Toxicology and Industry Health, reads, in part, that "[b]enzene, a well-known cause of myelodysplastic syndrome (MDS) and acute myeloid leukemia (AML)[,] … is present as a contaminant in many common petrochemicals, including toluene, mineral spirits, and naphtha" (NYSCEF Doc No. 590, Chester-Schindler affirmation, exhibit 7 at 1).  The authors of the study concluded that "toluene's propensity to contain benzene as an impurity suggest benzene as a probable causative factor for their development of [AML].  Although the benzene concentration in widely used solvent mixtures varies, there is a reason to believe that even those containing amounts <0.1% have the potential to generate exposures capable of

---

[12] Rust-Oleum disputes whether Arco supplied any solvents to it between 1978 and 1993 based on Calle's testimony that she believed that the sales records Arco produced predated that period based on their formatting.

**153361/2020   LOTREAN, MARINEL vs. 3M COMPANY F/K/A MINNESOTA**
**Motion No.  022 023 024 025 026 027**

**Page 38 of 45**

causing AML" (*id.* at 7). A second study titled "Potential Uses of Petrochemical Products Can Result in Significant Benzene Exposures: MSDSs Must List Benzene as an Ingredient" (the Kopstein Study) published in the Journal of Occupational and Environmental includes a table listing the representative benzene content of numerous petrochemicals, such as VM&P naphtha, hexane, toluene, xylene and mineral spirits, that the study's author had compiled from various sources over a period of years (NYSCEF Doc No. 589, Chester-Schindler affirmation, exhibit 6 at 1, 4 and 7). Thus, Medina's opinion is not entirely without a basis in fact.

Last, the cases cited by Rust-Oleum are inapposite. *Hamilton v Beretta U.S.A. Corp.* (96 NY2d 222, 240-241 [2001]) concerns whether the theory of market share liability in products liability actions should be extended beyond litigation involving the drug diethylstilbestrol, or DES. The issue in both *Diel v Flintkote Co.* (204 AD2d 53, 53-54 [1st Dept 1994]) and *Cawein v Flintkote Co.* (203 AD2d 105, 106 [1st Dept 1994]) was whether the plaintiffs had sufficiently identified defendant Flintkote Co.'s products such that it could be held liable. By contrast here, plaintiff testified to having used a Rust-Oleum aerosol product to treat bare metal. Because Rust-Oleum has failed to "'unequivocally establish that its product could not have contributed to the causation of plaintiff's injury'" (*Horvath v Ameron Intl. Corp.*, — AD3d —, —, 2024 NY Slip Op 02147, *1 [1st Dept, April 23, 2024], quoting *Reid v Georgia-Pacific Corp.*, 212 AD2d 462, 463 [1st Dept 1995]), its motion for summary judgment on causation is denied.

## IV. DuPont (Motion Sequence No. 026)

DuPont contends that plaintiffs cannot establish either general or specific causation under *Parker*. Plaintiffs counter that their experts satisfy *Parker* and tender two affidavits from Medina and two affidavits from Dr. Harrison, one of which incorporates Dr. Harrison's affidavit

in *Cole v Safety-Kleen Systems, Inc., et al.*, Sup Ct, Onondaga County, index No. 002841/2018, and *Arpino v Ashland LLC, et al.*, Sup Ct, Onondaga County, index No. 007335/2018 (together, the Cole/Arpino Actions).

A. General Causation

As explained above, an expert opinion on causation must establish general causation, meaning the toxin to which the plaintiff was exposed must be capable of causing the plaintiff's particular condition (*Parker*, 7 NY3d at 448). Here, DuPont has established, prima facie, the absence of general causation (*Cornell*, 22 NY3d at 781). Board-certified toxicologist Patrick Kerzic (Kerzic) opines that there is no reliable scientific evidence to show that working with mineral spirits, naphthas, toluene, xylene and n-hexane are known to cause MDS, even in highly exposed workers (NYSCEF Doc No. 505, Flora affirmation, exhibit L, Kerzic aff, ¶¶ 2-4). Kerzic states that the International Agency for Research on Cancer (IARC), which is part of the World Health Organization, and the National Toxicology Program (NTP) within the U.S. Department of Health and Human Services, maintain lists of known and suspected human carcinogens and update those lists periodically (NYSCEF Doc No. 505, ¶¶ 4-5). Kerzic states that the IARC and the NTP have concluded that mineral spirits, naphthas, toluene, xylene and n-hexane are not known human carcinogens nor does the NTP list them as reasonably anticipated to be human carcinogens (*id.*). Kerzic explains that mineral spirits, naphthas, toluene, xylene and n-hexane have their own toxicological profile, and while small, trace amounts of benzene may be present, this does not impact the chemical's toxicity (*id.*, ¶ 6). Kerzic cites numerous studies discussing whether mineral spirits, naphthas, toluene, xylene and n-hexane are toxic to the hematopoietic system, including evaluations by the United States Environmental Protection Agency (USEPA) on the carcinogenic potential of toluene and xylene, and states that none

reported damage to the hematologic system or that exposure increased the risk of developing MDS or cancer (*id.*, ¶¶ 9-14). Thus, DuPont has demonstrated that the solvents in its products to which plaintiff was allegedly exposed are not capable of causing his particular condition.

DuPont has also shown that Dr. Harrison appears to have improperly relied on benzene studies to conclude that the solvents in its products can cause MDS. The Court of Appeals has explained that, where benzene is a component of another substance, such as gasoline, the "[k]ey … is the relationship, if any, between exposure to *gasoline* containing benzene as a component and AML" (*Parker*, 7 NY3d at 449-450). In *Parker*, "[p]laintiff's experts were unable to identify a single epidemiologic study finding an increased risk of AML as a result of exposure to gasoline" (*id.* at 450; *see also Burst v Shell Oil Co*., 650 Fed Appx 170, 173 [5th Cir 2016] [granting summary judgment where "Dr. Harrison made no attempt to demonstrate how benzene-specific studies could reliability support his conclusion that gasoline containing benzene can cause AML, or to explain or demonstrate how he extrapolated his findings with respect to gasoline from the benzene studies"]). A brief review of plaintiffs' CPLR 3101 (d) exchange reveals that Dr. Harrison listed epidemiological studies on benzene, but not the solvents in DuPont's products (NYSCEF Doc No. 503, Flora affirmation, exhibit J at 6-7).

Plaintiffs, however, have raised a triable issue of fact in response. In his affidavit, Dr. Harrison begins by stating that the USEPA, NIOSH, NTP, OSHA, and the California Environmental Protection Agency have all classified benzene as a known human carcinogen (NYSCEF Doc No. 636, Chester-Schindler affirmation, exhibit 7, Dr. Harrison 9/14/2023 aff at 21-22). Dr. Harrison cites numerous epidemiological studies that state exposure to benzene can significantly increase the risk of developing MDS/AML (*id.* at 17-20), including a study by the IARC in 1966 (*id.* at 20). Dr. Harrison opines that "occupational exposure to benzene, including

[* 41]

organic solvents containing benzene, is a cause of MDS/AML" (*id.* at 16). Dr. Harrison further elaborates on the effects of benzene on blood and bone marrow and the existence of benzene in solvents refined from petroleum in his 187-page affidavit in the Cole/Arpino Actions (*id.*, ¶¶ 53-76, 78, 81-82 and 106). Dr. Harrison cites specific studies in which persons exposed to organic solvents containing benzene, such as toluene, were found to have bone marrow damage or increased risks of cancer, including MDS (*id.*, ¶¶ 117-119, 187 and 223). Dr. Harrison opines:

> "Benzene exposure has been shown to cause AML, MDS and other lymphohematopoietic cancers regardless of whether benzene is emitted from straight benzene, hydrocarbon mixtures or chemicals such as toluene, xylene and hexane contaminated with benzene. Indeed, the large majority of benzene epidemiology studies reporting increased risks of cancer involve subjects exposed from mixtures, and not straight benzene, and who are concurrently exposed to other aromatic hydrocarbons. In fact, there is evidence that concurrent exposure to toluene can enhance benzene's genotoxicity" (*id.*, ¶ 274).

Medina refers to a 1989 study from the IARC reporting on the myelotoxic effects of benzene-contaminated toluene or xylene and four other studies, including the Peckham Study and the Kopstein Study, on benzene as a trace impurity in solvents like toluene (NYSCEF Doc No. 635, Chester-Schindler affirmation, exhibit 6, Medina 11/1/2023 aff at 1-2). Given the competing expert evidence, DuPont's motion for summary judgment based on general causation is denied (*see Sason v Dykes Lbr. Co., Inc.*, 221 AD3d 491, 492 [1st Dept 2023]).

B. Specific Causation

Specific causation requires the plaintiff to "provide a[ ] scientific expression linking … actual exposure to [a toxin] to a level known to cause [the plaintiff's condition]" (*Sason*, 221 AD3d at 492, quoting *Nemeth*, 38 NY3d at 346). It is not enough for an expert to opine that a plaintiff was "'frequently' exposed to 'excessive' amounts of [the toxin]" (*Parker*, 7 NY3d at 449).

DuPont argues that Dr. Harrison's anticipated testimony is too generic to constitute a scientific expression of plaintiff's exposure level and does not provide a reliable correlation between plaintiff's benzene exposure, as calculated by Medina, and the amount of benzene necessary to cause MDS. DuPont also contends that Medina's quantitative assessment is too generic and is not the product of any generally accepted methodology. DuPont, though, merely points to perceived gaps in plaintiffs' proof, which is insufficient to satisfy their prima facie burden on summary judgment (*see Dyer*, 207 AD3d at 409).

In any event, plaintiffs have raised a triable issue of fact that "plaintiff was exposed to levels of [benzene] that are known to cause the kind of harm that the plaintiff claims to have suffered" (*Cornell*, 22 NY3d at 784 [internal quotation marks and citation omitted]). Medina employed a "Site Conceptual Model" and a "Two Zone Model with a Constant Emission Rate" to calculate plaintiff's exposure to benzene while working at Camera (NYSCEF Doc No. 496, Flora affirmation, exhibit C at 31 and 37-38). Medina describes the site conceptual model as "a standard exposure assessment approach to characterize exposures by developing an exposure profile based on as detailed a description as possible of jobs, tasks, and workplace conditions to quantify the potential exposure for each task and time period" and that he considered that sampling data from published sources as well as DuPont's Carmine Body Shop study from 1978 in his assessment (NYSCEF Doc No. 635 at 3). Medina avers that he chose the Two Zone Model to assess plaintiff's exposure to DuPont's primers, paints and thinners because this "model is explicitly designed to calculate near-field concentrations and is most appropriate for specific tasks performed at close range from the breathing zone where that is the main contribution to inhalation exposure" (*id.* at 4). In a supplement to his original report, Dr. Harrison avers that "MDS is often a precursor to acute myelogenous leukemia ('AML') and,

[* 43]

therefore, studies evaluating the causes of AML are relevant to the causes of MDS" (NYSCEF Doc No. 637, Chester-Schindler affirmation, exhibit 7, Dr. Harrison 10/9/2023 aff at 2 n). Dr. Harrison states that "[c]umulative dose benzene exposure is a commonly used metric for assessing risk of disease," and that "peak level benzene exposure are predictors of AML, MDS and leukemia risk" (NYSCEF Doc No. 636, ¶ 276). Dr. Harrison then discusses several studies correlating specific levels of benzene exposure to MDS or AML and concludes to a reasonable degree of medical certainty that plaintiff's cumulative exposure to defendants' products was sufficient to cause his MDS (NYSCEF Doc No. 636 at 1). Given the competing expert evidence, DuPont's motion for summary judgment based on specific causation is denied.

## **CONCLUSION**

Accordingly, upon the foregoing papers and after oral argument, it is

ORDERED that the motions of defendants Exxon Mobil Corporation (motion sequence no. 022), Atlantic Richfield Company (motion sequence no. 023), and Shell Oil Company (motion sequence no. 027) for summary judgment are granted, and the complaint and all cross-claims are dismissed as against them; and it is further

ORDERED that the said claims and cross-claims as against defendants Exxon Mobil Corporation, Atlantic Richfield Company, and Shell Oil Company are severed and the balance of the action shall continue; and it is further

ORDERED that the Clerk of the Court shall enter judgment in favor of defendants Exxon Mobil Corporation, Atlantic Richfield Company, and Shell Oil Company dismissing the claims and cross-claims made against them in this action, together with costs and disbursements to be taxed by the Clerk upon submission of an appropriate bill of costs; and it is further

[* 44]

ORDERED that the motion of defendant Zep Inc., sued individually and as successor-in-interest to Acuity Specialty Products, a division of Acuity Brands, Inc., successor-in-interest to Lighting Equipment and Chemical Divisions of National Services Industries, Inc., D/B/A Zep Manufacturing F/K/A National Linen Service Corporation, for summary judgment (motion sequence no. 024) is granted to the extent of dismissing that part of the first cause of action predicated on a design defect and a failure-to-warn, dismissing the third cause of action in its entirety, and dismissing plaintiffs' request for punitive damages, and that part of the first cause of action predicated on a design defect and a failure-to-warn, the third cause of action, and plaintiffs' request for punitive damages are dismissed as against said defendant, and the balance of the motion is otherwise denied; and it is further

ORDERED that the motion of defendant Rust-Oleum Corporation, sued individually and as successor-in-interest to Rust-Oleum Corporation, for summary judgment (motion sequence no. 025) is denied; and it is further

ORDERED that the motion of defendant E.I. DuPont de Nemours and Company for summary judgment (motion sequence no. 026) is denied; and it is further

ORDERED that the Clerk shall mark the file accordingly.

This constitutes the Decision and Order of the court.

NANCY M. BANNON, J.S.C.
HON. NANCY M. BANNON

**4/26/2024**
**DATE**

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | | GRANTED | | DENIED | X | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

**153361/2020   LOTREAN, MARINEL vs. 3M COMPANY F/K/A MINNESOTA**                                    **Page 45 of 45**
**Motion No.  022 023 024 025 026 027**

[* 45]